IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA and

STATE OF OHIO,

Plaintiffs,

v.

DOVETAIL ENERGY, LLC, EMERALD BIOENERGY, LLC, AND RENERGY, INC.

Defendants

Civil No. 2:26-cv-1286

**CONSENT DECREE**

Plaintiff United States of America, on behalf of the United States Environmental Protection Agency (EPA), jointly with Plaintiff State of Ohio (the State), on behalf of the Ohio Environmental Protection Agency (Ohio EPA) and the Regional Air Pollution Control Agency (RAPCA), has filed a Complaint in this action concurrently with this Consent Decree, alleging that Defendants Dovetail Energy, LLC, Emerald Bioenergy, LLC, and Renergy Inc. (collectively, Defendants), violated Section 110 of the Clean Air Act (CAA or Act), 42 U.S.C. § 7410.

The violations that give rise to this Consent Decree took place at the Defendants' biogas facilities located at 1156 Herr Road in Fairborn, Ohio (Dovetail Facility) and at 2279 County Road 156 in Cardington, Ohio (Emerald Facility) (collectively, Facilities). Defendants owned and operated the Facilities, including the anaerobic digesters and other related Covered Process Units at the Facilities, to produce biogas.

The United States and the State contend that Defendants have violated several requirements of Permits to Install and Operate (PTIOs) issued for the Facilities by Ohio EPA pursuant to federally-enforceable provisions of the Ohio State Implementation Plan, including: improper venting of biogas to atmosphere, excess hydrogen sulfide concentration in the biogas, excess sulfur dioxide emissions from the flare and engine operations, improper operation of the engines, improper operation of the flares, and failure to report all deviations required by the PTIOs. The injunctive relief in this Consent Decree is intended to correct the violations and prevent their reoccurrence.

On September 22, 2023, Defendants and the State entered into an Amended Consent Order in the Court of Common Pleas of Greene County Ohio. As part of that Order, Defendants agreed to permanently shut down operations at the Dovetail Facility by January 31, 2024.

Pursuant to that Amended Consent Order, Defendants requested and received extensions until February 14, 2024, to completely flush and clean out all equipment, a process that was completed by that date. The Dovetail Facility is now permanently shut down, but Defendants continue to own the Dovetail Facility, including the anaerobic digester and its related Covered Process Units. Defendants continue to own, operate, and produce biogas at the Emerald Facility.

The United States has reviewed Financial Information submitted by Defendants, which is generally described in Appendix 6, regarding their financial ability to pay a civil penalty in this action. Based on that information, the United States has determined that Defendants have limited financial ability to pay a civil penalty in this action.

Defendants do not admit any liability to the United States or the State arising out of the transactions or occurrences alleged in the Complaint.

Digester Energy Cardington LLC intends to acquire the assets that comprise the Emerald Facility. Digester Energy LLC intends to acquire the assets that comprise the Dovetail Facility. The Complaint does not allege that Digester Energy Cardington LLC or Digester Energy LLC are liable for any of the violations alleged in the Complaint.

If the Closing Date occurs, Digester Energy Cardington LLC and Digester Energy LLC will each become a Responsible Party as defined herein. If the Closing Date does not occur, neither Digester Energy Cardington LLC nor Digester Energy shall have any obligation or liability under this Consent Decree.

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I of this Decree, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Act, 42 U.S.C. § 7413(b), and over the Parties. Venue lies in this District pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a) because Defendants reside in this judicial district. For purposes of this Decree, or any action to enforce this Decree, Defendants consent to the Court's jurisdiction over this Decree, any such action, and over Defendants, and Defendants consent to venue in this judicial district. For the purposes of this Decree, or any action to enforce this Decree, Digester Energy Cardington LLC and Digester Energy LLC consent to the Court's exercise of subject matter and personal jurisdiction and the Court's jurisdiction over this Decree, and consent to venue for the purposes of enforcing Digester Energy Cardington LLC and Digester Energy LLC's obligations under this Consent Decree.

2. For purposes of this Consent Decree, Defendants agree that the Complaint states claims upon which relief may be granted pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## II. APPLICABILITY

3. The obligations of this Consent Decree apply to and are binding upon the United States and the State, and upon the Responsible Parties and any successors, assigns, or other entities or persons otherwise bound by law.

4. No transfer of ownership or operation of a Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve a Responsible Party of their

obligation to ensure that the terms of the Decree are implemented. At least 30 Days prior to such transfer, the Responsible Party shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region V, the United States Attorney for the Southern District of Ohio, the United States Department of Justice, the Ohio Attorney General's Office, and the Ohio Environmental Protection Agency in accordance with Section XIV (Notices). Any attempt to transfer ownership or operation of the Facilities without complying with this Paragraph constitutes a violation of this Decree.

5. Each Responsible Party shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Each Responsible Party shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6. In any action to enforce this Consent Decree, Responsible Parties shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III. DEFINITIONS

7. Terms used in this Consent Decree that are defined in the Act or in regulations promulgated pursuant to the Act have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

"Above Ground Gas Storage Tank" means tanks or other containers that are above ground, partially buried, bunkered, or in a subterranean vault, and used to store gas.

"Annual" or "annually" means a calendar year.

"Average" means the arithmetic mean.

"Biogas" means any gaseous product typically formed through the anaerobic decomposition of organic waste materials in the anaerobic digestion system and composed principally of methane and $CO_2$. Anaerobic digestion systems, include, but are not limited to, covered lagoon, complete mix, plug flow, and fixed film digesters.

"Biomethane Upgrade" means the process of treating Biogas to be Renewable Natural Gas (RNG), aka biomethane. Biomethane is pipeline-quality gas that is fully interchangeable with conventional natural gas.

"Biomethane Upgrade Equipment" means the equipment involved in the process of treating biogas to upgrade it to Biomethane. This includes, but is not limited to, equipment designed to remove carbon dioxide, water, hydrogen sulfide, or other elements from biogas.

"Closing Date" means the date(s) that Digester Energy Cardington LLC and Digester Energy LLC purchase the assets that generally comprise the Emerald and Dovetail Facilities, respectively.

"Complaint" means the complaint filed by the United States and the State in this action.

"Consent Decree" or "Decree" means this Decree, and all appendices attached hereto (listed in Section XXV (Appendices)).

"Combustion Device" means a device capable of combustion, including combustion of biogas and propane, such as a flare or engine.

"Covered Equipment" means all valves, connectors, pumps, agitators, and/or piping in biogas or biogas-adjacent service at Covered Process Units, including but not limited to:

a. Biomethane Upgrade Equipment;

b. Over-under valves;

c. Mechanical pressure relief valves;

d. Biogas sample point ball valves (near over-under valves);

e. Access hatches, including but not limited to sludge removal hatches;

f. Pressure relief valves;

g. Liquid receiving tanks and solids receiving hoppers;

h. Liquid receiving manholes;

i. Valves or gas piping between biomass tanks and digester tank headspace;

j. Radar sensor ports;

k. View ports;

l. Biogas dome ball valve sample ports;

m. Biogas dome pressure sensor connection points;

n. Biogas dome membranes;

o. Weather dome excess air vents;

p. Butterfly valves on flare and engine biogas pipes;

q. Ball valves on flare biogas pipes;

r. Flare blower connections;

s. Engine blower connections;

t. Condensate pipes and traps;

u. Desulfurization blowers; and

v. Any other valves or ports identified as connected to biogas service.

"Covered Process Units" means the units at the Facilities in Biogas, Biomethane or Biogas-adjacent service, including all Covered Equipment at the units.

"Day" means a calendar day unless expressly stated to be a business day. In computing any period of time for a deadline under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period runs until the close of business of the next business day.

"Defendants" means Dovetail Energy, LLC, Emerald Bioenergy, LLC, and Renergy Inc.

"DOJ" means the United States Department of Justice and any of its successor departments or agencies.

"Dovetail Facility" means the anaerobic digestion facility located at 1156 Herr Road in Fairborn, Ohio, not in operation at the time of lodging of the Consent Decree.

"Effective Date" means the definition provided in Section XV (Effective Date).

"Emerald Facility" means the anaerobic digestion facility located at 2279 County Road 156 in Cardington, Ohio.

"EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

"Facility" or "Facilities" means the Emerald Facility; the Dovetail Facility if operations restart during the duration of this Consent Decree; and any other anaerobic digester operation owned by Defendants that is in operation at any time during the duration of this Consent Decree.

"Flare-Cycle" means the cycle of the flare igniting, the flare operating to combust gas routed to it, the flare ceasing to combust gas, and the downtime prior to the flare igniting again. The next flare-cycle begins when the flare ignites again.

"Financial Information" means the documentation identified in Appendix 6, which was submitted to the United States by Defendants and which Defendants assert includes Confidential Business Information (CBI).

"Governments" means the United States and the State.

"Method 21" means the test method found at 40 C.F.R. Part 60, Appendix A, Method 21. To the extent that the Covered Equipment is subject to regulations that modify Method 21, those modifications shall be applicable.

"Ohio EPA" means the Ohio Environmental Protection Agency.

"Paragraph" means a portion of this Decree identified by an Arabic numeral.

"Parties" means the United States, the State, Defendants, Digester Energy Cardington LLC, and Digester Energy LLC.

"Permits" means any Permit-to-Install (PTI) or Permit-to-Install and Operate (PTIO) issued by Ohio EPA for air pollution sources at any Facility, including PTIO number P0125003 at the Emerald Facility, or any other current or subsequent air pollution permits issued by local, state, or federal entities for air pollution sources at any other Facilities, in effect during the term of the Consent Decree.

"Responsible Party" means the party responsible for the applicable Consent Decree provisions, as follows:

a. Dovetail Facility: Defendants prior to the Closing Date and Digester Energy LLC on and after the Closing Date.

b. Emerald Facility: Defendants prior to the Closing Date and Digester Energy Cardington LLC on and after the Closing Date.

c. Any other anaerobic digester operation owned by Defendants that is in operation at any time during the duration of this Consent Decree: Defendants.

"Rolling 12-Month Period" means a rolling period of 12 consecutive months, beginning with the 12 consecutive months preceding the month in which this Consent Decree takes effect.

"Section" means a portion of this Decree identified by a Roman numeral.

"State" means the State of Ohio, acting on behalf of the Ohio EPA.

"United States" means the United States of America, acting on behalf of the EPA.

## IV. CIVIL PENALTY

8. Within 90 Days after the Effective Date, Defendants shall pay the sum of $15,000 as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging. The civil penalty payment will be divided equally between the United States and the State and paid as specified below. Digester Energy Cardington LLC and Digester Energy LLC shall bear no responsibility for the payment of this civil penalty.

9. Civil Penalty Based on Inability to Pay.

a. The civil penalty required to be paid is based on the United States' review of Financial Information submitted by Defendants and the United States' subsequent determination that Defendants have a limited ability to pay a civil penalty for the violations alleged in this case.

b. Defendants certify that, to the best of their knowledge and belief, after thorough inquiry, they have submitted to the United States financial information that fairly, accurately, and materially sets forth their financial circumstances, and that those circumstances have not materially changed between the time Defendants submitted the financial information and the time Defendants execute this Consent Decree.

10. Defendants shall pay the civil penalty due to the United States, together with interest on that portion of the Penalty due to the United States, by FedWire Electronic Funds Transfer (EFT) to the DOJ account, in accordance with instructions provided to Defendants by the Financial Litigation Unit (FLU) of the United States Attorney's Office for the Southern District of Ohio after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System (CDCS) number, which Defendants shall use to

identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

Renergy, Inc.
Attn: Alex Ringler
PO Box 249, Delaware, OH 43015
419-253-5300
alex@renergy.com

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to DOJ and EPA in accordance with Section XIV (Notices).

11. At the time of payment, Defendants shall send notice that payment to the United States has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to DOJ in accordance with Section XIV (Notices); and (iii) to EPA in accordance with Section XIV (Notices). Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States and the State of Ohio vs. Dovetail Energy, LLC, Emerald Bioenergy, LLC, and Renergy, Inc.* and shall reference the civil action number, CDCS Number, and DOJ case number 90-5-2-1-12791.

12. Payment to the State shall be made by delivering to Hannah Smith, Paralegal, or her successor, Office of the Ohio Attorney General, 30 E. Broad St., 25th Floor, Columbus, OH 43215, a certified check for the appropriate amount, payable to the order of "Treasurer, State of Ohio."

13. If any amount due to the State is not paid in accordance with the terms of this Consent Decree, the Ohio Attorney General may collect that amount under Ohio Rev. Code §131.02. Pursuant to Ohio Rev. Code §109.081, in addition to the outstanding balance due under

this Consent Decree, collection costs of ten percent shall be owing and fully recoverable from Defendants to be paid into the State Treasury to the credit of the Attorney General Claims Fund.

14. The State reserves the right to file a certificate of judgment lien against Defendants for the remaining unpaid balance of the total civil penalty, plus applicable statutory interest and collection costs, if the full civil penalty payment is not paid according to this Consent Decree.

15. Defendants shall not deduct any penalties paid under this Decree pursuant to this Section or Section VIII (Stipulated Penalties) in calculating their federal, State, or local income tax.

## V. COMPLIANCE REQUIREMENTS

16. No terms or conditions of this Consent Decree, including the provisions in this Section, shall be construed as authorizing the release of uncontrolled emissions into the atmosphere.

### A. SUPPLEMENTAL GAS

17. For the Emerald Facility, upon the Effective Date and continuing until commencement of operation of the automated system required by Paragraph 18, the Responsible Party shall use existing equipment to utilize supplemental gas in the form of propane or natural gas, as necessary to meet or exceed the minimum net heating values required by the Permits, or in the absence of a minimum net heating value in a Permit, 500 Btu/scf, in accordance with the requirements of Paragraphs 18 through 27 below.

18. For the Emerald Facility, within 18 months of the Effective Date, and for any other Facility, upon the latter of the commencement of operation or the Effective Date, the Responsible Party shall use an automated system to utilize supplemental gas, in the form of propane or natural gas, as necessary to meet or exceed the minimum net heating values required

by the Permits, or in the absence of a minimum net heating value in a Permit, 500 Btu/scf, in accordance with the requirements of Paragraphs 19 through 27 below.

19. For a Facility in operation on the Effective Date, upon the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, the Responsible Party shall monitor the biogas, at the frequency described below, for methane percentage and hydrogen sulfide concentration in parts per million (ppm), at a location after the exit of the anaerobic digester and any biogas treatment process but prior to the entrance of the flare, engine, or other Combustion Device. Monitoring shall be conducted at least one time per Day, with the following exceptions:

a. The Responsible Party is not required to conduct this monitoring at a Facility on a Saturday, Sunday, or federal holiday observed by the Responsible Party if all of the following conditions are met:

i. the Facility is not staffed;

ii. the most recent available net heating value, determined using the most recent biogas measurements, meets or exceeds the minimum net heating value required by the applicable Permit;

iii. no change in biogas quality that would lower the net heating value below the minimum net heating value required by the Permit is reasonably expected; and

iv. supplemental gas is not being utilized.

b. If supplemental gas is being utilized, the monitoring frequency for methane percentage shall be increased to at least once per Flare-Cycle.

20. After monitoring the biogas, the Responsible Party shall immediately:

a. record the monitoring results;

b. utilize the monitoring results to determine the net heating value; and

c. record the net heating value result.

21. For a Facility in operation on the Effective Date, upon the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, if the net heating value of the incoming waste gas stream to the engine, flare, or other Combustion Device is below the minimum required net heating value set forth in the applicable Permit, or in the absence of a minimum net heating value in a Permit, 500 Btu/scf, the Responsible Party shall add supplemental gas such that the incoming gas stream to the engine, flare, or other Combustion Device meets or exceeds the minimum required net heating value. The Responsible Party shall continue to utilize supplemental gas until the net heating value of the gas stream, without supplemental gas, meets or exceeds the minimum net heating value required by the applicable Permit.

22. For the Emerald Facility, within 18 months of the Effective Date, and for any other Facility, upon the latter of the commencement of operation or the Effective Date, the Responsible Party shall install and utilize a propane flow meter to continuously monitor, and utilize the supervisory control and data acquisition system ("SCADA") to continuously record, the supplemental gas flow from the Above Ground Gas Storage Tank when supplemental gas is added to the biogas stream. For the Emerald Facility, within 18 months of the Effective Date, and for any other Facility, upon the latter of the commencement of operation or the Effective Date, the Responsible Party shall install and utilize a flow control valve to automatically modulate the supplemental gas flow rate leaving an Above Ground Gas Storage Tank to meet or exceed the minimum required net heating value set forth in the applicable Permit, or in the absence of a minimum net heating value in a Permit, 500 Btu/scf, without exceeding the capacity

of the engine, flare, or other Combustion Device to which gas is being routed. The Responsible Party shall verify the control valve's position is appropriate for the flow rate(s) needed to achieve the minimum required net heating value of the incoming gas stream to the engine, flare, or other Combustion Device.

23. For a Facility in operation on the Effective Date, upon the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, in the event supplemental gas is being utilized, the Responsible Party shall increase the frequency of measurement of methane percentage to at least once per Flare-Cycle during operating hours. The Responsible Party shall immediately utilize the measured methane percentage to calculate the supplemental gas flow rate needed to maintain a net heating value that meets or exceeds the net heating value required by the applicable Permit, or in the absence of a minimum net heating value in a Permit, 500 Btu/scf. If the net heating value does not meet or exceed the net heating value required by the applicable Permit, the blower speed and/or the supplemental gas control valve shall automatically adjust, without operator involvement, to reach and maintain a net heating value that meets or exceeds the net heating value required by the applicable Permit.

24. If, for any reason, the Responsible Party's capability to add supplemental gas to the incoming waste gas stream at any flare at a Facility is impaired, that flare is deemed inoperable for purposes of Subsections V.A (Supplemental Gas) and V.B (Combustion Devices). If the period of inoperability may, in the exercise of reasonable judgment, be 48 hours or more in duration, Defendants must follow Subsection V.B (Combustion Devices) such that the affected Facility has operable Combustion Devices and/or Biomethane Upgrade Equipment available

with the collective capacity to combust and/or Biomethane Upgrade two times the reasonably expected maximum biogas production levels.

25. The Responsible Party at each Facility shall implement the Supplemental Gas Standard Operating Procedure (Supplemental Gas SOP) set forth in Appendix 1 of this Consent Decree, or any updates thereto approved by EPA, for carrying out the requirements of this Subsection of the Consent Decree. The Responsible Party shall review and update the Supplemental Gas SOP as needed; if the Supplemental Gas SOP is updated, the Responsible Party shall submit the updated Supplemental Gas SOP to EPA for approval within 30 Days of completing the update. In the event of a conflict between the Supplemental Gas SOP and any Consent Decree term(s) or condition(s), the Consent Decree term(s) or conditions(s) shall control.

26. For a Facility in operation on the Effective Date, upon the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, the Responsible Party shall train each personnel member on the Supplemental Gas SOP elements relevant to the person's duties. The Responsible Party shall train new personnel on the Supplemental Gas SOP elements relevant to the person's duties prior to any involvement (other than supervised involvement for purposes of training) in Supplemental Gas SOP implementation. The Responsible Party shall require and provide refresher training to each personnel member at least once per calendar year, beginning in the first full year after completion of the personnel member's initial training. The Responsible Party shall maintain records of initial and refresher trainings.

27. Each Responsible Party shall maintain electronic and readily accessible records of the information required pursuant to this Subsection of the Consent Decree.

**B. COMBUSTION DEVICES**

28. For a Facility in operation on the Effective Date, upon the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, the Responsible Party must ensure that the Facility is equipped with one or more permanent Combustion Devices or Biomethane Upgrade Equipment that, collectively, have sufficient capacity to combust or Biomethane Upgrade two times the reasonably expected maximum biogas production levels. The Responsible Party must maintain the permanent Combustion Devices and the Biomethane Upgrade Equipment in good working order.

29. For a Facility in operation on the Effective Date, upon the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, if a flare, engine, or Biomethane Upgrade Equipment at a Facility becomes or is anticipated to become inoperable (i.e. offline and not immediately available for use) and the period of inoperability may, in the exercise of reasonable judgment, be 48 hours or more in duration, the Responsible Party must bring temporary Combustion Device(s) onsite at the affected Facility, such that the affected Facility has operable Combustion Devices or Biomethane Upgrade Equipment available with the collective capacity to combust or Biomethane Upgrade two times the reasonably expected maximum biogas production levels, as follows:

a. if the inoperability is planned, the temporary Combustion Device(s) must be brought onsite prior to inoperability of a flare, engine, or Biomethane Upgrade Equipment; and

b. if the inoperability is unplanned, the temporary Combustion Device(s) must be brought onsite as soon as possible but within no more than 60 hours of a flare, engine, or Biomethane Upgrade Equipment becoming inoperable.

30. For a Facility in operation on the Effective Date, upon the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, if, for any reason, any Combustion Device (e.g., engine, flare, temporary Combustion Device) or Biomethane Upgrade Equipment at any Facility becomes or is anticipated to become inoperable (i.e. off-line and not immediately available for use), the Responsible Party must take all actions within its reasonable control to prevent venting. These actions include bringing onsite and utilizing temporary Combustion Devices, ceasing to feed material to the digester, and/or storing biogas until operable Combustion Devices or Biomethane Upgrade Equipment are in place.

31. Any Combustion Device onsite must be compatible for use with supplemental gas, and the Responsible Party shall utilize supplemental gas to ensure that the biogas bound for combustion meets the minimum required net heating values set forth in the Permits, as needed, when biogas quality is otherwise insufficient to meet minimum required net heating values. The determination of the need for and addition of supplemental gas shall be conducted in accordance with Subsection V.A (Supplemental Gas).

32. Each Responsible Party shall record the following information:

a. the date(s) and times (start and end) of planned and unplanned inoperability of a Combustion Device or Biomethane Upgrade Equipment, a description of the affected Combustion Device or Biomethane Upgrade Equipment, and the location of the affected Combustion Device or Biomethane Upgrade Equipment;

b. the installation date(s) and time(s) and installation location of any (permanent or temporary) Combustion Device;

c. documentation of the basis for installation of any (permanent or temporary) Combustion Device or Biomethane Upgrade Equipment;

d. run times of all (permanent and temporary) Combustion Devices or Biomethane Upgrade Equipment, in spreadsheet format, including, for each Combustion Device or Biomethane Upgrade Equipment, the date and duration of Combustion Device or Biomethane Upgrade Equipment usage; and

e. a description of each action taken to prevent venting during any period of planned or unplanned inoperability of any (permanent or temporary) Combustion Device or Biomethane Upgrade Equipment and the date(s) and time(s) the action was taken.

33. The Responsible Party shall maintain electronic and readily accessible records of the information required pursuant to this Subsection of the Consent Decree.

**C. BIOGAS LEAK MONITORING FOR ALL COVERED EQUIPMENT**

34. The Responsible Part(ies) each shall develop and implement a Biogas Leak Monitoring Program that satisfies the requirements of Paragraphs 35 through 48 below.

35. For a Facility in operation on the Effective Date, beginning no later than 30 Days after the Effective Date, and for a Facility that commences operation after the Effective Date, beginning no later than 30 Days after the commencement of operation, the Responsible Party shall conduct monthly monitoring of all Covered Equipment for leaks, with the exception of the equipment described in Paragraph 36, in accordance with Paragraphs 37-38 below.

36. For a Facility in operation on the Effective Date, beginning no later than 90 Days after the Effective Date, and for a Facility that commences operation after the Effective Date, beginning no later than 90 Days after the commencement of operation, the Responsible Party shall conduct annual monitoring of the following equipment for leaks: the biogas dome membrane, the inaccessible connection between the dome and the digester walls, the rooftop access hatches on the biomass tank, the valves and gas pipe between the biomass tank and the

digester tank headspace, and the elevated valves on the flare and the engine biogas pipes located near the top of the digester walls, in accordance with Paragraphs 37-38 below.

37. All monitoring shall comply with Method 21 and shall be conducted using a flame ionization detector instrument, catalytic combustion detector, tunable diode laser absorption spectroscopy instrument, or another appropriate monitor for measuring methane that meets the requirements of Method 21, unless an alternative method is approved by EPA after being requested by the Responsible Party. For each piece of Covered Equipment monitored, Defendants shall record the highest value (screening value), the date and time that each screening value is taken, and the technician's full name. The Responsible Party shall transfer this monitoring data to an electronic database within one week of the monitoring.

38. On each Day that monitoring occurs, at the end of such monitoring, the Responsible Party shall ensure that each monitoring technician certifies that the data collected accurately represents the monitoring performed that Day by requiring the monitoring technician to sign/initial the following certification:

> On [insert date], I reviewed the monitoring data that I collected today and to the best of my knowledge and belief, the data accurately represents the monitoring that I performed today.

39. If any monitoring detects a methane concentration of 500 ppm or higher, or if the Responsible Party detects a potential leak through audio, visual, or olfactory sensing or are informed of a potential leak, the Responsible Party shall replace or repair the piece of Covered Equipment in accordance with Paragraphs 40 through 43. In addition, the Responsible Party shall notify the Ohio EPA (Central Office) of such emission or potential leak via telephone or email within two hours of identification. Ohio EPA may change the recipient of the notice in the prior sentence by providing written notice in accordance with Section XIV (Notices).

40. Within five Days of detecting a leak, the Responsible Party shall replace or attempt to repair the Covered Equipment. If the first replacement or attempt to repair is unsuccessful, beginning no later than 15 Days after initial detection, the Responsible Party shall perform additional replacements or attempts at repair of the leaking piece of Covered Equipment such that the Covered Equipment is not leaking within 45 Days after detection. As stated in Paragraph 16 of this Consent Decree and, consistent with the Permits, this provision shall not be construed as authorizing the release of uncontrolled emissions into the atmosphere.

41. Each Responsible Party shall monitor, in accordance with Paragraphs 37-38, any piece of Covered Equipment that underwent repair or replacement within 24 hours to evaluate the repair or replacement. If the monitoring detects a methane concentration of 500 ppm or higher, or if the Responsible Party detects a potential leak through audio, visual, or olfactory sensing or is informed of a potential leak, the repair or replacement shall be deemed unsuccessful.

42. While monitoring repairs and replacements, the Responsible Party shall record the date of all repair and replacement attempts; the repair or replacement methods used during each repair or replacement attempt; and the date, time, and Screening Values for all re-monitoring events.

43. For Covered Equipment that is undergoing replacement or repair, the Responsible Party shall use good engineering judgement to select a new piece(s) of equipment for the service and operating conditions.

44. The Responsible Party shall maintain, and utilize for operator reference and training, a Biogas Leak Monitoring Program SOP that includes the following:

a. procedures for monitoring Covered Equipment for leaks and making repairs, in accordance with the requirements of this Subsection of the Consent Decree;

b. descriptions of the roles and responsibilities of all employees and, if any, contractor personnel, assigned to Biogas Leak Monitoring Program functions at the Facilities (Biogas Leak Monitoring Personnel);

c. procedures for determining if new equipment is Covered Equipment and tracking equipment for the purpose of ensuring that new pieces of Covered Equipment added to the Facility for any reason are integrated into the Biogas Leak Monitoring Program and that pieces of Covered Equipment that are taken out of service are removed from the Biogas Leak Monitoring Program; and

d. a protocol for providing initial and at least annual refresher training to existing and new Biogas Leak Monitoring Personnel on Biogas Leak Monitoring Program procedures.

45. Each Responsible Party shall implement the Biogas Leak Monitoring Program SOP set forth in Appendix 2 of this Consent Decree, or any updates thereto approved by EPA. The Responsible Party shall review the Biogas Leak Monitoring Program SOP on an annual basis and update it as needed by no later than December 31 of each year. In the event of an update to the Biogas Leak Monitoring Program SOP, the Responsible Party shall submit the updated Biogas Leak Monitoring Program SOP to EPA for approval within 30 Days of completing the update. In the event of a conflict between the Biogas Leak Monitoring Program SOP and any Consent Decree term(s) or condition(s), the Consent Decree term(s) or conditions(s) shall control.

46. By the commencement of monthly monitoring pursuant to Paragraph 35, each Responsible Party shall train each Biogas Leak Monitoring Personnel member on the Biogas Leak Monitoring Program SOP elements relevant to the person's duties. The Responsible Party shall train new Biogas Leak Monitoring Personnel on the Biogas Leak Monitoring Program SOP elements relevant to the person's duties prior to any involvement (other than supervised involvement for purposes of training) in Biogas Leak Monitoring Program implementation. The Responsible Party shall require and provide refresher training to each Biogas Leak Monitoring Personnel member at least once per calendar year, beginning in the first full year after completion of the Biogas Leak Monitoring Personnel member's initial training. The Responsible Party shall maintain records of initial and refresher trainings.

47. By the commencement of monthly monitoring pursuant to Paragraph 35, the Responsible Party shall, consistent with the Biogas Leak Monitoring Program SOP, track equipment for the purpose of ensuring that new pieces of equipment added to a Facility for any reason are integrated into the Biogas Leak Monitoring Program and that pieces of equipment that are taken out of service are removed from the Biogas Leak Monitoring Program. The Responsible Party shall maintain records of equipment additions and removals.

48. The Responsible Party shall maintain electronic and readily accessible records of the information required pursuant to this Subsection of the Consent Decree.

**D. ADDITIONAL MONITORING OF PRESSURE RELIEF VALVES**

49. For a Facility in operation on the Effective Date, within 90 Days of the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, the Responsible Party shall conduct continuous monitoring for the purpose of identifying venting or possible venting from the anaerobic digester's pressure relief valves (PRVs) and piping, via the means and in accordance with the requirements described below.

a. Pressure Sensor Monitoring.

i. The Responsible Party shall install, operate, and maintain a pressure sensing device at each PRV to continuously monitor pressure to detect PRV opening, which, to account for valve chattering events, is defined as any pressure over 3.15 inches of water column.

ii. The Responsible Party shall, via the computer control system, record each PRV opening and, for each PRV opening, the continuous pressures, the date, and the duration of pressure exceeding 3.15 inches of water column, including start and stop times. The computer control system shall automatically and concurrently alarm operators of each PRV opening in a manner to ensure timely response in accordance with Paragraph 50.

b. Gas Dome Level Monitoring. The Responsible Party shall continuously monitor the gas dome level and, via the computer control system, automatically record and alarm operators when the gas dome level is 90% or higher.

c. Ambient Air Quality Monitoring. The Responsible Party shall install, operate, and maintain fixed air monitors to continuously monitor the ambient air near each PRV, at a proximity close enough to detect leaks from the PRVs, and, via the computer control system, automatically record and alarm operators when $CO_2$ concentrations are above 1,000 ppm for $CO_2$. Each fixed air monitor shall have an appropriate span to detect for $CO_2$ (i.e., a span of more than 1,000 ppm). The Responsible Party shall calibrate each fixed air monitor in accordance with manufacturer's recommendations.

d. Visual/Auditory/Olfactory Observation. The Responsible Party shall record any visual, auditory, or olfactory observations that indicate that venting is or may be

occurring from PRVs or piping, specifically noting the date, time, location, and description of the observation.

50. The Responsible Party shall respond to venting or possible venting detected via the monitoring required by Paragraph 49 in accordance with the following requirements.

a. If a pressure sensor alarm occurs, the Responsible Party shall investigate the cause of the PRV opening triggering the alarm within two hours of detection and promptly take appropriate action to alleviate the need for continuing pressure release as expeditiously as possible. The Responsible Party shall document the time of PRV opening, the cause of the release, the corrective actions performed, the time and date of each corrective action performed, and the time of PRV closure.

b. If a gas dome level alarm or ambient air alarm occurs, the Responsible Party shall investigate the cause of the alarm within two hours and, if venting is occurring, take appropriate action to cease venting as expeditiously as possible. The Responsible Party shall document the time of alarm, the cause of the alarm, and corrective actions performed to alleviate the alarm. If venting was found, the Responsible Party shall also document corrective actions performed to cease venting, and the time and date of each corrective action performed.

c. If a visual, auditory, or olfactory observation indicates that venting is or may be occurring, the Responsible Party shall investigate the cause of the observation within two hours of the observation and, if venting is occurring, take appropriate action to cease venting as expeditiously as possible. The Responsible Party shall document the cause of the observation, and, if venting was found, the corrective actions performed to cease venting, the corrective action timeline, and information sufficient to demonstrate that corrective actions were performed as expeditiously as possible.

d. For any event subject to the requirements of this Paragraph, the Responsible Party shall also notify the Ohio EPA of such emission or potential venting via telephone or email within four hours of identification. Ohio EPA may change the recipient of the notice in the prior sentence by providing written notice in accordance with Section XIV (Notices).

51. The Responsible Party shall implement, and utilize for operator reference and training, the Operator SOP for Additional Monitoring of Pressure Relief Valves (Operator SOP) set forth in Appendix 3 of this Consent Decree, or any updates thereto approved by EPA, for conducting the monitoring and response activities required by this Subsection of the Consent Decree. The Responsible Party shall review and update the Operator SOP as needed; in the event of an update to the Operator SOP, Responsible Party shall submit the updated Operator SOP to EPA for approval within 30 Days of completing the update.

52. In the event of a conflict between the Operator SOP and any Consent Decree term(s) or condition(s), the Consent Decree term(s) or conditions(s) shall control.

53. The Responsible Party shall maintain electronic and readily accessible records of the information required pursuant to this Subsection of the Consent Decree.

**E. SPARE PARTS INVENTORY**

54. For a Facility in operation on the Effective Date, within 30 Days of the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, the Responsible Party shall establish and maintain an inventory onsite at the Facility of spare parts that may reasonably be required for maintenance and repair of critical equipment. Spare parts for critical equipment, such as the flare, engine, and other equipment that provide a critical function at the Facility, shall be maintained to minimize equipment downtime.

A critical function includes any function that would require the system or any part of the air emission control system to be offline while awaiting repair or replacement.

**F. MAINTENANCE OF SELECT PROCESS EQUIPMENT**

55. For a Facility in operation on the Effective Date, within 30 Days of the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, the Responsible Party shall either cap or flush equipment with openings to the atmosphere, such as hoses, after each use for the on-site transportation of digestate, food waste, manure, or other waste. After the equipment is no longer in active use, the Responsible Party shall either cap or otherwise close any openings on the equipment to prevent emissions from material remaining in the equipment or flush the equipment to remove residue materials from inside the equipment and deposit them in the digester, food waste receiving pits, barn manure holding pits, or sludge lagoon(s) as appropriate and in compliance with applicable laws for proper handling.

**G. HYDROGEN SULFIDE TREATMENT**

56. The Responsible Party shall maintain the hydrogen sulfide levels in the biogas at 1,000 ppm or below.

57. In an effort to maintain the hydrogen sulfide levels in the biogas at 1,000 ppm or below, the Responsible Party must provide in-situ treatment as described in the Hydrogen Sulfide In-Situ Treatment SOP set forth in Appendix 4 of this Consent Decree or any updates thereto approved by EPA. The Responsible Party shall review and update the Hydrogen Sulfide In-Situ Treatment SOP as needed; in the event of an update to the Hydrogen Sulfide In-Situ Treatment SOP, the Responsible Party shall submit the updated Hydrogen Sulfide In-Situ Treatment SOP to EPA for approval within 30 Days of completing the update.

58. In the event of a conflict between the Hydrogen Sulfide In-Situ Treatment SOP and any Consent Decree term(s) or condition(s), the Consent Decree term(s) or conditions(s) shall control.

59. The Responsible Party shall take measurements of the hydrogen sulfide in the biogas at least once per week, at the locations and using the method specified in the Hydrogen Sulfide In-Situ Treatment SOP. If the Responsible Party measures hydrogen sulfide, at the locations and using the method specified in the Hydrogen Sulfide In-Situ Treatment SOP, more frequently than once per week, the Responsible Party shall not average the results. If any individual measurement yields a result of 900 ppm or higher, the Responsible Party shall:

a. Increase the frequency of the hydrogen sulfide measurements, at the locations and using the method specified in the Hydrogen Sulfide In-Situ Treatment SOP, to at least once per Day, until the hydrogen sulfide levels are measured at below 900 ppm. If the Responsible Party measure hydrogen sulfide more than once per Day, at the locations and using the method specified in the Hydrogen Sulfide In-Situ Treatment SOP, the Responsible Party shall not average the results.

b. Take corrective actions to reduce the hydrogen sulfide concentration below 900 ppm, as described in the Hydrogen Sulfide In-Situ Treatment SOP.

60. For each hydrogen sulfide measurement taken, the Responsible Party shall record: the date of the measurement, the time of the measurement, the location of the measurement, the name of the person conducting the measurement, the result of the measurement, and any corrective action taken in response to the measurement, including the nature, date, and time of the corrective action.

61. If, at any Facility, in any two individual calendar months in a Rolling 12-Month Permit, more than 5% of the total number of individual measurements taken in an individual calendar month exceed 1,000 ppm, the Responsible Party shall take the following actions with respect to the affected Facility:

a. Within 30 Days of the last Day of the month that triggers action under the preceding Paragraph, submit a plan to EPA, for approval, for installation and operation of a control technology designed to remove at least 95% of the hydrogen sulfide from the biogas (Hydrogen Sulfide Treatment Plan). The Hydrogen Sulfide Treatment Plan must include a detailed description of the proposed control technology, including the make and model, and the proposed location for installation of the control technology, which must be prior to the flare and the engine so that all biogas bound for the flare or engine is treated by the control technology prior to combustion; and

b. Within 30 Days of EPA approval of the Hydrogen Sulfide Treatment Plan, submit a complete permit application to Ohio EPA for installation and operation of the control technology approved by EPA, and concurrently provide a copy of the permit application to EPA.

62. Within 30 Days of receipt of a permit from Ohio EPA, install and continuously operate the control technology approved by EPA pursuant to the following:

a. The control technology shall be installed prior to the flare and the engine so that all biogas bound for the flare or the engine is treated by the control technology prior to combustion;

b. The control technology shall be selected using good engineering judgment and based on its ability to effectively treat the hydrogen sulfide in the biogas at the Facilities;

c. The control technology shall be installed, operated, and maintained according to manufacturer's specifications and recommendations. A copy of the manufacturer's specifications and recommendations must be kept onsite at the relevant Facility and available for use, in either physical or digital format;

d. The Responsible Party shall maintain onsite at the relevant Facility a log of all dates of maintenance of the control technology; and

e. The Responsible Party shall maintain electronic and readily accessible records of the information required pursuant to this Subsection of the Consent Decree.

## H. MEASURES TO ENSURE COMPLIANCE WITH PERMIT MONITORING, RECORDKEEPING, AND REPORTING REQUIREMENTS

63. For a Facility in operation on the Effective Date, upon the Effective Date, and for a Facility that commences operation after the Effective Date, upon commencement of operation, the Responsible Party shall complete the following actions to ensure adherence to monitoring, recordkeeping, and reporting requirements of the Permits, including accurate reporting of permit deviations:

a. the Responsible Party shall implement the Compliance Monitoring, Recordkeeping, and Reporting SOP in Appendix 5;

b. the Responsible Party shall train staff on the Compliance Monitoring, Recordkeeping, and Reporting SOP and maintain electronic and readily accessible proof of certification for the staff that have completed the training. The Responsible Party shall train any new staff on the Compliance Monitoring, Recordkeeping, and Reporting SOP prior to such staff engaging in any of these activities; and

c. the Responsible Party shall review and update the Compliance Monitoring, Recordkeeping, and Reporting SOP as needed. In the event of an update to the

Compliance Monitoring, Recordkeeping, and Reporting SOP, the Responsible Party shall submit the updated Compliance Monitoring, Recordkeeping, and Reporting SOP to EPA for approval within 30 Days of completing the update.

64. In the event of a conflict between an SOP and any Consent Decree term(s) or condition(s), the Consent Decree term(s) or conditions(s) shall control.

**I. APPLICATION FOR REVISED PERMIT**

65. No later than six months after the Effective Date, the Responsible Party shall submit an application to Ohio EPA to update its Permits to include the Biogas Leak Monitoring Plan included in Subsection V.C (Biogas Leak Monitoring for all Covered Equipment) as a method for determining compliance with the permit condition to not vent biogas. The Responsible Party shall also include in the permit application to Ohio EPA the requirement to properly install, operate, and maintain according to manufacturer's specifications the monitoring and control of supplemental gas usage included in Subsection V.A (Supplemental Gas) and the pressure sensing devices included in Subsection V.D (Additional Monitoring of Pressure Relief Valves).

## VI. REVIEW AND APPROVAL OF DELIVERABLES

66. Approval of Deliverables. All deliverables, including any plan, report, or other item that is required to be submitted, shall be submitted to both EPA and Ohio EPA in the timeframe identified for the deliverable. After review of any plan, report, or other item that is required to be submitted for approval pursuant to this Consent Decree, EPA, after consultation with the State, will in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

67. If the submission is approved pursuant to Paragraph 66(a), the Responsible Party shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part pursuant to Paragraph 66(b) or (c), the Responsible Party shall, upon written direction from EPA after consultation with the State, take all actions required by the approved plan, report, or other item that EPA after consultation with the State determines are technically severable from any disapproved portions.

68. If the submission is disapproved in whole or in part pursuant to Paragraph 66(c) or (d), the Responsible Party shall, within 30 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, the Responsible Party shall proceed in accordance with the preceding Paragraph.

69. If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA, after consultation with the State, may again require the Responsible Party to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies.

70. If the Responsible Party elects to invoke Dispute Resolution as set forth in Section X (Dispute Resolution) concerning a decision by EPA to disapprove, approve on specified conditions, or modify a deliverable, the Responsible Party shall do so by sending a Notice of Dispute in accordance with Paragraph 98 within 30 Days (or such other time as the Parties agree to in writing) after receipt of the applicable decision.

71. Any stipulated penalties applicable to the original submission, as provided in Section VIII (Stipulated Penalties), accrue during the 30-Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of the Responsible Party's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

72. Timely and Complete Applications and Delays in Permits or Approvals. Where any compliance obligation under Section V (Compliance Requirements) requires the Responsible Party to obtain a federal, state, or local permit or approval, the Responsible Party shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. The Responsible Party may seek relief under the provisions of Section IX (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if the Responsible Party has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VII. REPORTING REQUIREMENTS

73. After the Effective Date of this Decree, the Responsible Party shall submit the following reports to EPA, DOJ, and the State at the addresses set forth Section XIV (Notices):

a. By July 31st and January 31st of each year after the lodging of this Consent Decree, until termination of this Decree pursuant to Section XVIII (Termination), each Responsible Party shall submit electronically a semi-annual report for the preceding six months that includes but is not limited to: the status of compliance measures; problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; operation and maintenance; reports to state agencies; net heating value records required by

Subsection V.A (Supplemental Gas); information required by Subsection V.B (Combustion Devices), Paragraph 32; monthly biogas leak monitoring records and evidence of required corrective actions required by Subsection V.C (Biogas Leaking Monitoring for all Covered Equipment); a list of any alarms and evidence of appropriate corrective actions required by Subsection V.D (Additional Monitoring of Pressure Relief Valves); and information required by Subsection V.G (Hydrogen Sulfide Treatment), Paragraph 62. The report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and the remedial steps taken, or to be taken, to prevent or minimize such violation.

b. If any Responsible Party violates, or have reason to believe that it may violate, any requirement of this Consent Decree, that Responsible Party shall notify DOJ, EPA, and the State of such violation and its likely duration, in writing, within 10 business Days of the Day the Responsible Party first becomes aware of the violation, with an explanation of the violation's likely cause and the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, the Responsible Party shall so state in the report and shall provide as detailed an explanation as is possible at the time of submission of the report. The Responsible Party shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day the Responsible Party become aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves the Responsible Party of its obligation to provide the notice required by Section IX (Force Majeure).

74. Whenever any violation of this Consent Decree or of any applicable permits or any other event affecting the Responsible Parties' performance under this Decree may pose an

immediate threat to the public health or welfare or the environment, the Responsible Party shall notify EPA by telephone at (312) 886-2776 or by email to R5AirEnforcement@epa.gov and Schulz.Natalie@epa.gov and the State by telephone at (614) 644-8655 or by email to Joshua.Koch@epa.ohio.gov as soon as possible, but no later than 24 hours after the Responsible Party first knew of the violation or event. This procedure is in addition to any other reporting requirements under State or Federal law, and in addition to the requirements set forth in the preceding Paragraph.

75. Each report submitted by the Responsible Party under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of perjury that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

76. This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

77. The reporting requirements of this Consent Decree do not relieve the Responsible Party of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

78. Any information provided pursuant to this Consent Decree may be used by the United States or the State in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VIII. STIPULATED PENALTIES

79. Each Responsible Party shall be liable for stipulated penalties to the United States and the State for violations of this Consent Decree by such Responsible Party as specified below, unless excused under Section IX (Force Majeure). Neither Defendants nor Digester Energy Cardington LLC and Digester Energy LLC shall be liable for violations of obligations of this Consent Decree applicable to the other Responsible Parties. A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

80. Late Payment of Civil Penalty. If Defendants fail to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Defendants shall pay a stipulated penalty of $3,000 per Day for each Day that the payment is late.

81. Compliance Requirements.

a. The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Subparagraph b by a Responsible Party:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $1,500 | 15th through 30th Day |
| $2,000 | 31st Day and beyond |

b. 1) The use of Supplemental gas as required by Subsection V.A (Supplemental Gas); 2) the use of Combustion Devices as required by Subsection V.B (Combustion Devices); 3) the implementation of a Biogas Leak Monitoring Program as required by Subsection V.C (Biogas Leak Monitoring for all Covered Equipment); 4) the monitoring of pressure relief valves as required by Subsection V.D (Additional Monitoring of Pressure Relief Valves); 5) the use of a spare parts inventory as required by Subsection V.E (Spare Parts

Inventory); 6) the maintenance of select process equipment as required by Subsection V.F (Maintenance of Select Process Equipment); and 7) the provision of hydrogen sulfide treatment and, if applicable, installation of a control technology approved by EPA, as required by Subsection V.G (Hydrogen Sulfide Treatment).

c. The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Subparagraph d:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th Day |
| $750 | 15th through 30th Day |
| $1,500 | 31st Day and beyond |

d. 1) The use of SOPs for compliance monitoring, recordkeeping, and reporting, as required by Subsection V.H (Measures to Ensure Compliance with Permit Monitoring, Recordkeeping, and Reporting Requirements); and 2) the application for a revised permit as required by Subsection V.I (Application for Revised Permit).

82. Reporting Requirements. For failure to meet the reporting requirements of Section VII (Reporting Requirements), stipulated penalties shall accrue as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 14th Day |
| $750 | 15th through 30th Day |
| $1,500 | 31st Day and beyond |

83. Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

84. The Responsible Party shall pay stipulated penalties to the United States and the State within 30 Days of a written demand by either Plaintiff. The Responsible Party shall pay

fifty percent of the total stipulated penalty amount due to the United States and fifty percent of the total stipulated penalty amount due to the State. The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.

85. Stipulated penalties shall continue to accrue as provided in Paragraph 83, during any Dispute Resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement of the Responsible Party, the United States, and the State or by a decision of EPA or the State that is not appealed to the District Court, the Responsible Party shall pay accrued penalties determined to be owing, together with interest, to the United States or the State within 30 Days of the Effective Date of the agreement or the receipt of EPA's or the State's decision or order.

b. If the dispute is appealed to the District Court and the United States or the State prevails in whole or in part, the Responsible Party shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

c. If any Party appeals the District Court's decision, the Responsible Party shall pay all accrued penalties determined to be owing, together with interest, within 60 Days of receiving the final appellate court decision.

86. Upon the Effective Date, the stipulated penalty provisions of this Decree shall be retroactively enforceable with regard to any and all violations described in Paragraph 79 that have occurred prior to the Effective Date, provided that stipulated penalties that may have accrued prior to the Effective Date may not be collected unless and until this Consent Decree is entered by the Court.

87. The Responsible Party shall pay stipulated penalties owing to the United States in the manner set forth in Paragraph 10 and with the confirmation notices required by Paragraph 11, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid. The Responsible Party shall pay stipulated penalties owing to the State in the manner set forth in Paragraph 12.

88. If the Responsible Party fails to pay stipulated penalties according to the terms of this Consent Decree, the Responsible Party shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State from seeking any remedy otherwise provided by law for the Responsible Parties' failure to pay any stipulated penalties.

89. The payment of penalties and interest, if any, shall not alter in any way the Responsible Party's obligation to complete the performance of the requirements of this Consent Decree.

90. Non-Exclusivity of Remedy. Stipulated penalties are not the United States' or the State's exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XII (Effect of Settlement/Reservation of Rights), the United States and the State expressly reserve the right to seek any other relief they deem appropriate for the Responsible Party's violation of this Decree or applicable law, including but not limited to an action against the Responsible Party for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## IX. FORCE MAJEURE

91. "Force majeure," for purposes of this Consent Decree, means any event arising from causes beyond the control of the Responsible Party, of any entity controlled by the Responsible Party, or of the Responsible Party's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite the Responsible Party's best efforts to fulfill the obligation. Given the need to protect public health and welfare and the environment, the requirement that the Responsible Party exercises "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure, such that any delay or non-performance is, and any adverse effects of the delay or non-performance are, minimized to the greatest extent possible. "Force majeure" does not include financial inability to perform any obligation under this Consent Decree.

92. If any event occurs for which the Responsible Party will or may claim a force majeure, the Responsible Party shall provide notice by email to EPA and the State. The deadline for the initial notice is five Days after the Responsible Party first knew or should have known that the event would likely delay or prevent performance. The Responsible Party shall be deemed to know of any circumstance of which any contractor of, subcontractor of, or entity controlled by the Responsible Party knew or should have known.

93. If the Responsible Party seeks to assert a claim of force majeure concerning the event, within 14 Days after the notice under Paragraph 92, the Responsible Party shall submit further notice to EPA and the State that includes: (a) an explanation and description of the event and its effect on the Responsible Party's completion of the requirements of the Consent Decree; (b) a description and schedule of all actions taken or to be taken to prevent or minimize the delay and/or other adverse effects of the event; (c) if applicable, the proposed extension of time for the

Responsible Party to complete the requirements of the Consent Decree; (d) the Responsible Party's rationale for attributing such delay to a force majeure; (e) a statement as to whether, in the opinion of the Responsible Party, such event may cause or contribute to an endangerment to public health or welfare or the environment; and (f) all available proof supporting the claim that the delay was attributable to a force majeure.

94. Failure to submit a timely or complete notice or claim under Paragraph 92 regarding an event precludes the Responsible Party from asserting any claim of force majeure regarding that event, provided, however, that EPA may, in its unreviewable discretion, excuse such failure if it is able to assess to its satisfaction whether the event is a force majeure and whether the Responsible Party has exercised their best efforts, under Paragraph 91.

95. After receipt of any claim of force majeure, EPA, after a reasonable opportunity for review and comment by the State, will notify the Responsible Party of its determination whether the Responsible Party is entitled to relief under Paragraph 91 and, if so, the excuse of or the extension of time for performance of the obligations affected by the force majeure. An excuse of, or extension of, the time for performance of the obligations affected by the force majeure does not, of itself, excuse or extend the time for performance of any other obligation.

96. If the Responsible Party elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so no later than 15 Days after receipt of EPA's notice. In any such proceeding, the Responsible Party has the burden of proving that it is entitled to relief under Paragraph 91, that its proposed excuse or extension was or will be warranted under the circumstances, and that it complied with the requirements of Paragraphs 91 through 93. If the Responsible Party carries this burden, the delay or non-performance at issue

shall be deemed not to be a violation by the Responsible Party of the affected obligation of this Consent Decree identified to EPA, the State, and the Court.

## X. DISPUTE RESOLUTION

97. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. A Responsible Party's failure to seek resolution of a dispute under this Section concerning an issue of which it had notice and an opportunity to dispute under this Section prior to an action by the United States or the State to enforce any obligation of the Responsible Party arising under this Decree precludes the Responsible Party from raising any such issue as a defense to any such enforcement action.

98. Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when the Responsible Party sends DOJ, EPA, the Ohio Attorney General's Office, and Ohio EPA a written Notice of Dispute. Such Notice of Dispute shall clearly state the matter in dispute, including the government agency or agencies with whom the dispute arose. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the Responsible Party, the United States, and the State cannot resolve a dispute by informal negotiations, then the position advanced by the United States, or, if the United States does not advance a position (such as where the Responsible Party's dispute arose with only the State and the United States does not wish to advance a position), the position advanced by the State shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, the Responsible Party invokes formal dispute resolution procedures as set forth below.

99. Formal Dispute Resolution. The Responsible Party shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by sending DOJ, EPA, the Ohio Attorney General's Office, and Ohio EPA a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting the Responsible Party's position and any supporting documentation relied upon by the Responsible Party.

100. The United States and the State may each serve Statements of Position or may serve a joint Statement of Position. Statement(s) of Position from the United States and the State shall be served within 45 Days of receipt of the Responsible Party's Statement of Position. The Governments' Statement(s) of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon. The United States' Statement of Position, or, if applicable, the United States' and the State's joint Statement of Position, is binding on the Responsible Party, unless the Responsible Party files a motion for judicial review of the dispute in accordance with the following Paragraph. If the United States does not serve a Statement of Position, then the State's Statement of Position is binding on the Responsible Party, unless the Responsible Party files a motion for judicial review of the dispute in accordance with the following Paragraph.

101. Judicial Dispute Resolution. The Responsible Party may seek judicial review of the dispute by filing with the Court and serving on the United States and the State a motion requesting judicial resolution of the dispute. The motion: (a) must be filed within 14 Days of receipt of the Governments' Statement(s) of Position pursuant to the preceding Paragraph; (b) may not raise any issue not raised in informal dispute resolution pursuant to Paragraph 98, unless the Plaintiffs raise a new issue of law or fact in a Statement of Position; (c) shall contain a

written statement of the Responsible Party's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation; and (d) shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

102. The United States and/or the State shall respond to the Responsible Party's motion within the time period allowed by the Local Rules of this Court. The Responsible Party may file a reply memorandum to the extent permitted by the Local Rules.

103. Standard of Review

a. Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 98 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules, or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, the Responsible Party shall have the burden of demonstrating, based on the administrative record, that the position of the United States or State is arbitrary and capricious or otherwise not in accordance with law.

b. Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 98, the Responsible Party shall bear the burden of demonstrating that its position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

104. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of the Responsible Party under this

Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 85. If the Responsible Party does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI. INFORMATION COLLECTION AND RETENTION

105. The United States, the State, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any Facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a. monitor the progress of activities required under this Consent Decree;

b. verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree;

c. obtain samples and, upon request, splits of any samples taken by any Responsible Party or their representatives, contractors, or consultants;

d. obtain documentary evidence, including photographs and similar data; and

e. assess the Responsible Parties' compliance with this Consent Decree.

106. Upon request, the Responsible Party shall provide EPA and the State or their authorized representatives splits of any samples taken by the Responsible Party. Upon request, EPA and the State shall provide the Responsible Party splits of any samples taken by EPA or the State.

107. Until five years after the termination of this Consent Decree, each Responsible Party shall retain and shall instruct its contractors and agents to preserve all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that

come into its or its contractors' or agents' possession or control, and that relate in any manner to the Responsible Party's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States or the State, the Responsible Party shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

108. At the conclusion of the information-retention period provided in the preceding Paragraph, each Responsible Party shall notify the United States and the State at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the State, the Responsible Party shall deliver any such documents, records, or other information to EPA or the State. The Responsible Party may assert that certain documents, records, or other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Responsible Party asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by the Responsible Party. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

109. The Responsible Party may also assert that information required to be provided under Section XI (Information Collection and Retention) is protected as Confidential Business Information (CBI) under 40 C.F.R. Part 2. As to any information that the Responsible Party

seeks to protect as CBI, the Responsible Party shall follow the procedures set forth in 40 C.F.R. Part 2.

110. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of any Responsible Party to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

111. This Consent Decree resolves only the civil claims of the United States and the State for the violations alleged in the Complaint filed in this action through the date of lodging.

112. The United States and the State reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State to obtain penalties or injunctive relief under the Act or implementing regulations or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 111. The United States and the State further reserve all legal and equitable remedies to address any conditions if there is or may be an imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, any Facilities, whether related to the violations addressed in this Consent Decree or otherwise.

113. The United States and the State reserve, and this Consent Decree is without prejudice to, the right to reinstitute or reopen this action as to Defendants with respect to the civil penalty, or to commence a new action seeking relief against Defendants other than as provided in this Consent Decree, if the Financial Information provided by Defendants, or the financial certification made by Defendants in Paragraph 9, is false or, in any material respect, inaccurate.

114. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, civil penalties, other appropriate relief relating to a Facility or Defendants' violations, the Responsible Parties shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, claim preclusion (res judicata), issue preclusion (collateral estoppel), claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 111.

115. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations. The Responsible Parties are responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits, and the Responsible Parties' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that the Responsible Parties' compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act or with any other provisions of federal, state, or local laws, regulations, or permits.

116. This Consent Decree does not limit or affect the rights of the Responsible Parties or of the United States or the State against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against the Responsible Parties except as otherwise provided by law.

117. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII. COSTS

118. The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and the State shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by the Responsible Party.

## XIV. NOTICES

119. Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and sent by mail or email, with a preference for email, addressed as follows:

| | |
|---|---|
| As to DOJ by email (preferred): | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-5-2-1-12791 |
| As to DOJ by mail: | EES Case Management Unit<br>Energy and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Re: DJ # 90-5-2-1-12791 |
| As to EPA by email (preferred): | R5AirEnforcement@epa.gov<br>Schulz.Natalie@epa.gov |
| As to EPA by mail: | Natalie Schulz<br>U.S. Environmental Protection Agency<br>Region V<br>77 West Jackson Blvd., ECA-18J<br>Chicago, IL 60604 |
| As to the State: | Assistant Attorney General Casey Chapman<br>Air Unit Supervisor, or her successor<br>Ohio Attorney General's Office<br>30 E. Broad Street, 25th Floor<br>Columbus, Ohio 43215<br><br>Joshua S. Koch<br>Compliance & Enforcement Manager,<br>Division of Air Pollution Control<br>Ohio EPA |

50 W. Town Street, Suite 700
Columbus, Ohio 43215
614.644.8665
Joshua.Koch@epa.ohio.gov

As to Defendants:

Renergy, Inc.
Attn: Alex Ringler
PO Box 249, Delaware, OH 43015
419-253-5300
alex@renergy.com

Benesch Law
Attn: Reed Sirak
127 Public Square, Suite 4900
Cleveland, OH 44114
216-363-6256
rsirak@beneschlaw.com

As to Digester Energy Cardington LLC and Digester Energy LLC:

Attn: Christopher C. Kuhns
9062 Bellbrook Road
Waynesville, Ohio 45068
937-673-5393
chad@kuhnsgroupinc.com

FGKS Law
Attn: John Deeds
100 S. Main Avenue, Ste. 300
Sidney, Ohio 45365
937-492-1271
jdeeds@fgks-law.com

120. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

121. Notices submitted pursuant to Section XIV (Notices) shall be deemed submitted upon mailing or transmission by email, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV. EFFECTIVE DATE

122. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted,

whichever occurs first, as recorded on the Court's docket, provided, however, that the Responsible Parties hereby agree that they shall be bound to perform duties scheduled to occur prior to the Effective Date. In the event the United States or the State withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XVI. RETENTION OF JURISDICTION

123. The Court shall retain jurisdiction over this case until termination of this Consent Decree for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections X (Dispute Resolution) and XVII (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XVII. MODIFICATION

124. The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Responsible Party, the United States, and the State. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

125. Any disputes concerning modification of this Decree shall be resolved pursuant to Section X (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 103, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII. TERMINATION

126. After the Responsible Party has completed the requirements of Section V (Compliance Requirements), has thereafter maintained continuous satisfactory compliance with this Consent Decree for a period of two years, has complied with all other requirements of this

Consent Decree, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, the Responsible Party may serve upon the United States and the State a Request for Termination, stating that Responsible Party has satisfied those requirements, together with all necessary supporting documentation.

127. Following receipt by the United States and the State of the Responsible Party's Request for Termination, the Responsible Party, the United States, and the State shall confer informally concerning the Request and any disagreement that the Responsible Party, the United States, and the State may have as to whether the Responsible Party has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States, after consultation with the State agrees that the Decree may be terminated as to the Responsible Party, the Responsible Party, the United States, and the State shall submit, for the Court's approval, a joint stipulation terminating the Decree as to the Responsible Party.

128. If the United States, after consultation with the State does not agree that the Decree may be terminated as to the Responsible Party, the Responsible Party may invoke Dispute Resolution under Section X (Dispute Resolution). However, the Responsible Party shall not seek Dispute Resolution of any dispute regarding termination until 60 Days after service of its Request for Termination.

129. At any time, if the United States, after consultation with the State, has sufficient information to determine that the Responsible Parties have met the requirements of termination under Paragraph 126, the United States, after notice to the Responsible Parties, may file a motion to terminate the Decree. If the parties are in agreement, a joint stipulation of termination may be filed with the Court.

130. If the United States does not have sufficient information to determine whether the Responsible Parties have met the requirements of termination under Paragraph 126, the United States may request additional information from the Responsible Parties, as permitted pursuant to Section XI (Information Collection and Retention), which the Responsible Parties shall provide within 30 days of receiving the United States' request.

## XIX. PUBLIC PARTICIPATION

131. This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendants, Digester Energy Cardington LLC, and Digester Energy LLC, consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendants, Digester Energy Cardington LLC, and Digester Energy LLC in writing that it no longer supports entry of the Decree.

## XX. SIGNATORIES/SERVICE

132. Each undersigned representative of Defendants, Digester Energy Cardington LLC, Digester Energy LLC, State of Ohio, and the Principal Deputy Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice identified on the DOJ signature page below certifies that that person is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party that person represents to this document.

133. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Defendants, Digester Energy Cardington LLC, and Digester Energy

LLC agree to accept service of process by email with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendants need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXI. INTEGRATION

134. This Consent Decree, including deliverables that are subsequently approved pursuant to this Decree, constitutes the entire agreement among the Parties regarding the subject matter of the Decree and supersedes all prior representations, agreements, and understandings, whether oral or written, concerning the subject matter of the Decree herein.

## XXII. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

135. For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2), performance of Section II (Applicability), Paragraph 5; all of Section V (Compliance Requirements) and related Appendices 1, 2, 3, 4, 5, and 6; Section VI (Review and Approval of Deliverables), Paragraph 66-67; Section VII (Reporting Requirements), Paragraphs 73 and 75-78; and Section XI (Information Collection and Retention), Paragraphs 105-108, are restitution, remediation, or required to come into compliance with law.

## XXIII. HEADINGS

136. Headings to the Sections and Subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

## XXIV. FINAL JUDGMENT

137. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State, and Defendants.

## XXV. APPENDICES

138. The following Appendices are attached to and part of this Consent Decree:

"Appendix 1" is the Supplemental Gas SOP.

"Appendix 2" is the Biogas Leak Monitoring Program SOP.

"Appendix 3" is the Operator SOP for Additional Monitoring of Pressure Relief Valves.

"Appendix 4" is the Hydrogen Sulfide In-Situ Treatment SOP.

"Appendix 5" is the Compliance Monitoring, Recordkeeping, and Reporting SOP.

"Appendix 6" is a general description of the Financial Information submitted by Defendants.

Dated and entered this day of __________, 20____

_________________________________
UNITED STATES DISTRICT JUDGE

FOR THE UNITED STATES OF AMERICA:

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division
U.S. Department of Justice

10/09/2026
Date

Sasha Alvarenga

SASHA ALVARENGA
Trial Attorney
Environmental Enforcement Section
Energy and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 532-3925
Email: sasha.alvarenga@usdoj.gov

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

10/8/26
Date

Digitally signed by ROBERT PEACHEY
Date: 2026.10.08 17:20:26 -05'00'

ROBERT M. PEACHEY
Acting Regional Counsel
U.S. Environmental Protection Agency
Region 5 (C-14J)
77 West Jackson Boulevard
Chicago, IL 60604

HALA KUSS
Digitally signed by HALA KUSS
Date: 2026.08.24 16:08:56 -05'00'

HALA KUSS
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
Office of Regional Counsel

FOR THE STATE OF OHIO:

June 17, 2026
Date

D. ANDREW WILSON
OHIO ATTORNEY GENERAL

JOHN K. MCMANUS (037140)
CATHERINE ENGLISH (0096910)
MORGAN STARIC (0098185)
Assistant Attorneys General
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215
Telephone: (614) 466-2766
Facsimile: (614) 644-1926
jack.mcmanus@ohioago.gov
morgan.staric@ohioago.gov
catherine.english@ohioago.gov

FOR DEFENDANTS:

6/9/26
Date

Dovetail Energy LLC, Emerald Bioenergy LLC, Renergy Inc

Manager

FOR DIGESTER ENERGY CARDINGTON LLC:

June 9, 2026
Date

Christopher C. Kuhns
Manager

FOR DIGESTER ENERGY LLC:

June 9, 2026
Date

Christopher C. Kuhns
Manager

# Appendix 1 – Supplemental Gas SOP

RENERGY



# Standard Operating Procedure: Supplemental Gas Addition to Biogas Flare

## Table of Contents

1. Summary Opening
2. Objectives
3. Process & Procedure
   3A. Calibrate Instrumentation
   3B. Normal Flare and Engine Operations
   3C. Flare Operations with Propane Addition
   3D. Gas Ramp Up from Reseeding or Upset
4. Record Keeping and Reference Documents
5. Document Update

## 1. Summary Opening

- Supplemental propane will be added to the biogas stream when necessary to maintain a net heating value above 500 BTU/ft$^3$.
- Biogas quality is monitored, and the control system automatically adjusts the propane flow rate to maintain a net heating value above 500 BTU/ft$^3$ in the biogas-propane mixture directed to the flare.

## 2. Objectives

- Detail instructions for blending propane into flare gas stream, measuring biogas quality, and what monitoring should be done to maintain biogas quality.

# 3. Processes and Procedures

## 3A. Calibrate Instrumentation

- Following the schedule and procedures defined by the equipment manufacturer the following instrumentation involved in controlling propane addition should be calibrated and maintained.
  - Flow meter on biogas pipe downstream of biogas blower.
  - Flow meter on propane addition pipe.
  - Methane content sensor attached to flow meter on biogas pipe.
  - Flow control valve controlling propane addition.
- Calibration of the methane concentration sensor should be validated with routine biogas measurements taken with a handheld biogas meter used for biogas quality monitoring.
  - Current handheld biogas meter in use is Sewerin Multitec 545.

RENERGY

Supplemental Gas Addition SOP (To be updated following final design and construction of the Supplemental Gas addition and control systems)

## 3B. Normal Flare and Engine Operations

- If the methane concentration in biogas is greater than or equal to 56%, the flare and engine will be run without propane addition.
- Normal operation runs the engine at a constant rate and may periodically run the flare to burn excess biogas.
- Operations can be modified as necessary, as long as all biogas is directed either to the flare or the engine.

## 3C. Flare Operations with Propane Addition




***Figure 1:*** *Sketch describing instrumentation involved in propane addition to the flare.*

- If the methane content in biogas is less than 56%, propane will automatically be added via an automated flow control valve at the required flow rate.
- Propane addition rate should be validated by comparing the biogas composition and flow rate of propane displayed on the SCADA to the values in Table 1 in this SOP.
- If the rate of propane being added is different than the calculated amount, check instrument calibrations and investigate the cause.
- If the primary flare cannot operate, direct the biogas to the secondary flare.
    - Do not direct propane-biogas mixtures to the engine.

## 3D. Gas Ramp Up from Reseeding or Upset.

- When the digester is being started up and the methane content in the digester is not consistently above 20% v/v, direct biogas to the secondary flare and reduce the flow rate of the biogas blower to the secondary flare to approximately 300 cfm.
- If the methane content in the biogas during digester start-up is lower than the methane content sensor detection limit, use a target propane flow rate of 96 cfm and a biogas flow rate 300 cfm.
    - At this propane flow rate, the minimum target of 500 BTU/ft$^3$ will be reached with any biogas composition.
- Do not direct propane-biogas mixtures to the engine during start up of the digester.

## 4. Record Keeping and Reference Documents

- Daily Worksheet
  - When performing the daily gas composition measurement record:
    - Methane Content (Volume %)
    - Calculated Net Heating Value (NHV)
      - NHV = (Methane content volume %) times (896 BTU/$ft^3$).
    - Oxygen Content (Volume %)
    - Date, time, and location of measurement taken
    - Name of the person conducting the measurement
    - Corrective actions taken, if any
      - Include description, date, and time of action
      - If no actions are taken, mark “No action”
- Site Laboratory Safety Guideline
  - Comprehensive list of safety procedures, emergency procedures, and accident reporting

RENERGY

Supplemental Gas Addition SOP (To be updated following final design and construction of the Supplemental Gas addition and control systems)

***Table 1:*** *Reference table calculating propane flow rate required to maintain complete combustion in flare or engine. To use the table, select the gas destruction method the plant is using, then find the row with the current methane content measurement rounding down, the target propane flow rate should match the flow rate measured by the propane flow meter.*

| **Measured Methane Content in Biogas** | **Biogas Net Heating Value (BTU/ft²)** | **Biogas Blower Rate:** Flare - Normal Operation **350 cfm** | **Biogas Blower Rate:** Secondary Flare - Start-up **300 cfm** | **Biogas Blower Rate:** Engine - Normal Operations **210 cfm** |
|---|---|---|---|---|
| | | **Target Propane Flow Rate (cfm)** | | |
| **5%** | 45 | Reduce flare blower speed during start-up | 71 | 50 |
| **10%** | 90 | | 63 | 44 |
| **15%** | 134 | | 55 | 39 |
| **20%** | 179 | 55 | 48 | 33 |
| **25%** | 224 | 47 | 40 | 28 |
| **30%** | 269 | 39 | 33 | 23 |
| **35%** | 314 | 31 | 26 | 19 |
| **40%** | 358 | 23 | 20 | 14 |
| **41%** | 367 | 22 | 19 | 13 |
| **42%** | 376 | 20 | 17 | 12 |
| **43%** | 385 | 19 | 16 | 12 |
| **44%** | 394 | 17 | 15 | 11 |
| **45%** | 403 | 16 | 14 | 10 |
| **46%** | 412 | 15 | 13 | 9 |
| **47%** | 421 | 13 | 11 | 8 |
| **48%** | 430 | 12 | 10 | 7 |
| **49%** | 439 | 10 | 9 | 6 |
| **50%** | 448 | 9 | 8 | 6 |
| **51%** | 457 | 8 | 7 | 5 |
| **52%** | 466 | 6 | 5 | 4 |
| **53%** | 475 | 5 | 4 | 3 |
| **54%** | 484 | 4 | 3 | 2 |
| **55%** | 493 | 2 | 2 | 2 |
| **56%** | 502 | No Propane Addition Required | | |
| **57%** | 511 | | | |
| **58%** | 520 | | | |
| **59%** | 529 | | | |
| **60%** | 538 | | | |
| **70%** | 627 | | | |
| **80%** | 717 | | | |
| **90%** | 806 | | | |
| $H_{CH_4}$=33.4 MJ/$m^3$ $CH_4$ . $H_T$*948 BTU/MJ *0.0283 $ft^3/m^3$ = 896 BTU/$ft^3$ $CH_4$ $H_{C_3H_8}$=2,493 BTU/$ft^3$ $C_3H_8$ | | | | |

## 5. Document Updates

- 28-Oct-2024 document created
- 27-Nov-2024 document revised
- 07-April-2025 document revised

# Appendix 2 – Biogas Leak SOP

# Standard Operating Procedure: Biogas Leak Monitoring Program

## Table of Contents

1. Summary Opening
2. Objectives
3. Process & Procedure
    3A. Roles and Responsibilities of Biogas Leak Monitoring Program
    3B. Required Leak Detection Monitoring Points
    3C. Determining Qualification of New Equipment under Leak Monitoring Program
    3D. Annual Operator Training and Review of Monitoring Program
    3E. Repairs for Covered Equipment
    3F. Procedure for Monthly and Annual Leak Monitoring of Biogas Dome Membrane
    3G. Visual, Auditory, Olfactory Observations
4. Record Keeping and Reference Documents
5. Document Update
Appendix A: Monthly Required Monitoring of Covered Process Units
Appendix B: Annual Monitoring Requirements of Covered Process Units
Appendix C: Reference Photos of Covered Process Unit Locations

## 1. Summary Opening

- The biogas leak monitoring program SOP contains the processes and procedures for the monthly and annual leak monitoring requirements.

## 2. Objectives

- Standard Operating Procedure for Biogas Leak Monitoring required by US EPA to determine compliance with the permit condition to not vent biogas.
- Measurements for the biogas leak monitoring program must be taken using a flame ionization detector instrument, catalytic combustion detector, tunable diode laser adsorption spectroscopy, or another appropriate monitoring for measuring methane that meets Method 21 requirements.
- The biogas leak monitoring program must cover all qualifying covered process equipment (defined in Section 3B and listed in Appendix A and B) and report the highest value methane measurements at each reference point.

# 3. Processes and Procedures

## 3A. Role and Responsibilities of Biogas Leak Monitoring Program

- **Leak Monitoring Technician(s)** – responsible for performing the necessary leak monitoring measurements on a monthly and annual basis.

- **Lead Operator** – responsible for ensuring the leak monitoring measurements and annual refresher training program are performed to a satisfactory standard and that all monitoring records are kept up to date. In the event of an exceedance, lead operator is responsible for notifying Ohio EPA within 2 hours of leak identification.
- **Engineering Consultant or Sub-Contractor** – Potential support, if required, to determine if a new or repaired piece of covered equipment is suitable for installation and service.

## 3B. Required Leak Detection Monitoring Points

The required leak detection monitoring points include any area or process containing "Covered Process Equipment". "Covered Process Unit" means the units at the Facilities in biogas or biogas-adjacent service. The covered process unit points required to be monitored, updated as of October 28, 2024, are listed including reference photo identification in the following appendices:

- **Appendix A:** Monthly Required Monitoring of Covered Process Units
- **Appendix B:** Annual Monitoring Requirements of Covered Process Units
- **Appendix C:** Reference Photos of Covered Process Unit Locations

Renergy is responsible for keeping the above lists up to date after removal, replacement, or addition of any covered process unit.

## 3C. Determining Qualification of New Equipment under Leak Monitoring Program

- If newly installed equipment falls under the existing definition 'Covered Process Unit' defined above, they should be incorporated into Biogas Leak Monitoring Program.
- Covered Process Equipment taken out of service should be removed from the Biogas Leak Monitoring Program.

## 3D. Annual Operator Training and Review of Monitoring Program

- Renergy will be using the SEM5000 methane measuring instrument manufactured by QED Environmental Systems, in compliance with Method 21.
- Renergy is responsible for keeping the following items on site:
    - Reference calibration gas cylinders (0ppm and 500ppm methane calibration gas),
    - Hard copy of technical data sheets, and
    - Hard copy of the methane measurement user manual.
- Renergy must provide annual refresher training to their employees assigned to the Biogas Leak Monitoring program.

- Records of training and annual refreshers should be maintained in writing and kept for 5 years.
- The annual refresher training should cover the following:
  - Required monitoring points and recommended order of monitoring points
  - Corrective actions for leaks identified, including communication to US EPA.
- Renergy owners are responsible for an annual review of the Leak Detection Monitoring program and must be completed by no later than December 31 of each year.
- If updates are made to the SOP, Renergy shall submit the updated plan to US EPA for approval.

## 3E. Repairs for Covered Equipment

- Within 5 days of detecting a leak, Renergy staff should replace or attempt to repair the leaking covered equipment.
- If the initial replacement or repair is unsuccessful, no later than 15 days after initial detection, Renergy staff shall attempt an additional repair or replacement of the leaking covered equipment.
- Within 24 hours after the repair or replacement of a leaking covered equipment, Renergy staff shall monitor the location. If a methane concentration of 500 ppm or higher is detected, the repair shall be considered unsuccessful and further measures taken to complete successfully.
- Renergy staff are responsible for recording the date and time of any repairs or replacements of covered equipment.
- Renergy should notify Ohio EPA, DAPC, CO as soon as practicable if the anerobic digester cover undergoes repair or replacement. Renergy should notify US EPA of the repair or replacement at the time of the semi-annual report.

## 3F. Procedure for Monthly and Annual Leak Monitoring of Biogas Dome Membrane

- Appendix A contains the monthly measurement forms the monitoring technician is responsible for completing during monthly leak detection activities.
- Appendix B contains the annual measurement forms the monitoring technician is responsible for completing during annual leak detection activities.
- Appendix C contains reference photos of these locations and is used by Renergy during the annual leak detection refresher training.
- There is no prescribed order to perform the monitoring. Monitoring technicians are at liberty to choose depending on time of day, weather, and other factors.
- Prior to beginning any set of measurements, the monitoring technician must validate the SEM5000 equipment is still calibrated through a series of ‘bump test’ readings using air (0 ppm methane) and a 500 ppm methane reference calibration gas cylinder. The following six bump tests need to be performed followed by an up wind and down wind test:

- Bump Test 1: Air (0 ppm methane)
- Bump Test 2: 500 ppm methane calibration gas
- Bump Test 3: Air
- Bump Test 4: 500 ppm methane calibration gas
- Bump Test 5: Air
- Bump Test 6: 500 ppm methane calibration gas
- Up wind Test: upwind of the process vessels and piping
- Down wind Test: downwind of the process vessels and piping

- If all six bump tests "pass", then the monitoring technician can begin the leak detection program and begin recording measurements using Appendix A or B.
- For each measurement point, the operating technician must place the probe inlet at the surface of the component interface where leakage could occur. Move the probe along the interface periphery while observing the instrument readout.
- If an increased meter reading is observed, slowly sample the interface where leakage is indicated until the maximum meter reading is obtained. Leave the probe inlet at this maximum reading location for approximately two times the instrument response time.
  - When using a probe, the SEM5000 has a response time of 3.5 seconds, meaning the operating technician must place the probe at the maximum reading location for a minimum of 7 seconds.
- Operating technician must record the highest value of the test, date, time, and name of operator/technician performing the test. If no methane was detected (i.e., 0 ppm), the operator can check the 0 ppm box.
- After completing all required measurement points, the operating technician must complete the following:
  - Validate instrument is still calibrated using the same bump test calibration procedure described above.
  - If all the bump test validation tests pass, operator must sign the form to confirm the monitoring program has been completed.
- For the full detailed field calibration procedure, refer to the SEM5000 Operating manual.
- Refer to US EPA's Method 21, sections 8.3.1.1 to 8.3.2.2, for equipment specific monitoring techniques for the different covered process units listed in Appendix A requiring routine monitoring.

## 3G. Visual, Auditory, Olfactory Observation

- If the monitoring technician observes any visual, auditory, or olfactory signs of a biogas leak during their monitoring, the technician will make a note of the location and description of their observation.
- The monitoring technician shall inform Renergy staff of the observation and also must notify Ohio EPA of the potential leak within 2 hours of identification.

# 4. Record Keeping and Reference Documents

- Electronic Database for Leak Detection Record Keeping
    - For all monthly and annual monitoring measurements taken:
        - Transfer data to electronic database within 1 week of the monitoring
        - Data should include the date, time, location of measurement taken, name of the person conducting the measurement, and highest measurement recorded.
        - At the end of any measurement activity, the monitoring technician is responsible to sign/initial the following certification that will be printed on the data monitoring sheets (Ref: Appendix A and B):

*On [insert date], I reviewed the monitoring data that I collected today and to the best of my knowledge and belief, the data accurately represents the monitoring that I performed today.*

## 5. Document Updates

- 03-Oct-2024 document created
- 27-Nov-2024 document revised
- 07-April-2025 document revised

## Appendix A: Monthly Required Monitoring of Covered Process Units

| Location Name | Location ID | Methane Measurements | | Date and Time Measurement Recorded | Initials |
|---|---|---|---|---|---|
| | | 0ppm Measurement (Check box if applicable) | If not 0ppm, record highest measurement: | | |
| Over-Under relief port on digester tank | | | | | |
| Mechanical pressure relief valve on digester tank | | | | | |
| Biogas sample point ball valve (near under-over valve) | | | | | |
| Access hatches on biomass tank or digester tank, including but not limited to sludge removal hatches | | | | | |
| Pressure relief valve on biomass tank | | | | | |
| Valves or gas pipe between biomass tank and digester tank headspace | | | | | |
| Radar sensor port | | | | | |
| View port | | | | | |

RENERGY

Biogas Leak Monitoring SOP (To be updated following final design and construction of the revised biogas system, including Supplemental Gas addition and control systems)

| Location Name | Location ID | Methane Measurements | | Date and Time Measurement Recorded | Initials |
|---|---|---|---|---|---|
| | | 0ppm Measurement (Check box if applicable) | If not 0ppm, record highest measurement: | | |
| Biogas dome ball valve sample port | | | | | |
| Biogas dome pressure sensor connection point | | | | | |
| Weather dome blower, airline, and vent | | | | | |
| Butterfly valves on flare and engine biogas pipes | | | | | |
| Ball valves on flare biogas pipes | | | | | |
| Flare blower connections | | | | | |
| Engine blower connections | | | | | |
| Condensate pipes and trap | | | | | |
| Desulfurization blower | | | | | |
| Connection port on the Digester Tank | | | | | |
| Any other valves or ports identified as connected to biogas service. | | | | | |

## Appendix B: Annual Monitoring Requirements of Covered Process Units

| Location Name | Location ID | Measurements | | Date and Time Measurement Recorded | Initials |
|---|---|---|---|---|---|
| | | Check Box if 0ppm detected | If not 0ppm, record highest measurement: | | |
| Biogas dome membrane | | | | | |
| | | | | | |
| Any other valves or ports identified as connected to biogas service. | | | | | |

## Appendix C: Reference Photos of Covered Process Unit Locations

| Location Name | Location ID# | Photo of Covered Process Unit |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

# Appendix 3 – Pressure Relief Valves SOP

# Standard Operating Procedure: Additional Monitoring of Pressure Relief Valves

## Table of Contents

1. Summary Opening
2. Objectives
3. Process & Procedure
   3A. Visual, Auditory, and Olfactory Observation
   3B. Installation and Commissioning PRV Air Quality Monitors
   3C. Maintenance and Calibration PRV Air Quality Monitors.
   3D: Operational Response and Actions – Possible Pressure Relief Valve Opening Events
   3E: Spare Parts Inventory
4. Record Keeping and Reference Documents
5. Document Update

## 1. Summary Opening

- Pressure relief valves (PRVs) should be monitored by:
    a. Visual, Auditory, and Olfactory Observation.
    b. Pressure sensors installed at each PRV;
    c. Gas dome level monitoring;
    d. Ambient air quality monitor near the two pressure relief valves (PRVs) located on the catwalk, near the top of the digester tank.
- Readings from the pressure sensors, gas dome level sensor, and air quality monitor will be relayed to the site computer control system with set points to automatically alert operators of possible PRV opening events.

## 2. Objectives

- Detail instructions for operating and maintaining fixed air monitor to continuously monitor the ambient air for $CO_2$ near each PRV.
- Detail instructions of when to report possible PRV opening event to the EPA.
- System should be designed to record and alarm operators when $CO_2$ concentrations in air within 5 ft of the PRV exceeds 1000 ppm for $CO_2$ to indicate that biogas was vented through the PRV. The resolution for $CO_2$ monitoring is 1 ppm.
- System should be designed to record and alarm operators when biogas pressure below the PRVs is greater than 3.15 in WC to indicate that biogas may be vented through the PRV.

- System should be designed to record and alarm operators when biogas dome level is greater than 90% full to indicate that biogas should be directed to flare and engine to avoid a possible PRV opening event.

# 3. Processes and Procedures

## 3A. Visual, Auditory, Olfactory Observation

- During routine daily odor monitoring, operators should record any visual, auditory, or olfactory observations that indicate that venting is or may be occurring from PRV's.
- If venting is suspected, follow the steps defined in section 3D.

## 3B. Installation and Commissioning PRV Air Quality Monitors

For first time installation and commissioning, Renergy staff should consider the following:

- For outdoor installations, the sensors for air quality monitors should be placed within a 5-foot distance of each PRV to ensure reliable measurements from venting.
- Best practices from industry applications recommend installing the sensor near the point of interest, and the physical transmitter body in a more accessible location. This will improve accessibility during daily monitoring, particularly during adverse weather conditions, and during less common events such as calibration and maintenance.
- The PRV air quality monitors should be connected to a reliable and constant power supply.
- Refer to Renergy's 'Job Safety Analysis Document' regarding installation and maintenance of process instrumentation equipment at heights. Extra caution should be taken particularly during adverse weather conditions to ensure operator safety.

## 3C. Maintenance and Calibration of PRV Air Quality and Safety Monitors

- Calibration gas cylinders, or 'bump gas' cylinders, should be inventoried onsite for PRV monitor calibration. Operators should ensure these cylinders remain in working condition and have them replaced after being emptied or before expiry.
- According to manufacturer's instructions, the meter should be calibrated once per year using the standard calibration gases required.
- Before performing any work at heights near the PRV, operators should ensure personal gas safety monitors are bump tested before each use and that calibrations are performed monthly.

## 3D. Operational Response and Actions – Possible Pressure Relief Valve Opening Events.

- When a possible pressure valve opening event is indicated by:
  - Visual, Auditory, Olfactory Observation;
  - Pressure in the biogas pipe below the PVR is greater than 3.15 in WC;
  - When the $CO_2$ concentration is measured more than 1,000 ppm.

Investigate and report the event following these four steps:

1. Operator should log and record the instrument readings, date, and time in the site incident log.
2. Operator should climb the stairs to the digester catwalk to inspect the sensor and PRV valve. **Safety Note:** During this time, the operator should ensure a personal safety gas monitor is on their person and leave the premises if unsafe gas concentrations are detected. Follow the appropriate calibration and bump test procedure for the personal safety gas monitors.
   - In the event of a suspected PRV opening event, take immediate action to reduce the biogas level in the biogas dome by directing biogas to the engine and/or flare.
   - In the event of a suspected PRV opening event with biogas dome levels less than 90%, adjust the air inflating blower outlet damper until pressure at the PRV is less than 3.15 in WC.
   - Upon inspection, if the operator suspects a mechanical failure of the PRV has occurred, for example the PRV opening plate becoming stuck in an open position, operator should leave the area and retrieve a personal gas safety respirator before returning to continue inspection and begin repairs.
   - Refer to Renergy's 'Job Safety Analysis Document' for additional safety considerations regarding the maintenance and repair of process equipment and working at heights.
3. Record the suspected cause of the release, the corrective actions performed, and the duration of suspected venting in the incident log.
4. Inform the US EPA of the incident by telephone at (312) 886-2776 or by email to R5AirEnforcement@epa.gov and Schulz.Natalie@epa.gov.

## 3E. Spare Parts Inventory

- The Vendor of the ambient air $CO_2$ monitoring device does not recommend for any spare sensors be stored onsite because the sensors use infrared technology and so, regular replacement due to sensor degradation is not necessary. Operators should only look to replace the sensors after a message on the air monitor screen shows the operator should replace the sensor.
- Operators should ensure the appropriate gas calibration cylinders are inventoried onsite and replace the cylinders ahead of expiry or when the cylinders are emptied.

## 4. Record Keeping and Reference Documents

- Pressure at PRVs, Gas dome level, Air Quality Monitoring Data from PRVs is continuously monitored and recorded by the SCADA system. Required monitoring data should be stored for five years from date of recording.
- Daily Odor Monitoring Reports are completed daily and stored onsite. Required monitoring data should be stored for five years from date of recording.
- Remote Support from Vendor
  - Operators should keep contact information for the regional application engineer so fast communication can be guaranteed in the event remote or on-site support is required.
- Technical Data Sheet and User Manual
  - Physical copies of the technical data sheet and user manuals for the installed air quality monitor should be kept onsite at all times.

## 5. Document Updates

- 28-Oct-2024 document created
- 27-Nov-2024 document revised

# Appendix 4 – In-Situ Hydrogen Sulfide Treatment SOP

# Standard Operating Procedure: In-Situ Hydrogen Sulfide Treatment

## Table of Contents

1. Summary Opening
2. Objectives
3. Process & Procedure
   3A. Dosing sulfur control additives
   - Liquid additives
   - Solid or powder additives

   3B. Measuring Biogas Quality
   3C. Adjusting Additive Dosing – below 900 ppm $H_2S$
   3D. Adjusting Additive Dosing – above 900 ppm $H_2S$
4. Record Keeping and Reference Documents
5. Document Update

## 1. Summary Opening

- Additives for sulfur control are fed to the digester to manage $H_2S$ formation and the resulting $H_2S$ concentration in the biogas.
- Biogas quality is monitored to inform adjustment to the dosing program to maintain $H_2S$ in the biogas below the permit limit of 1,000 ppm.

## 2. Objectives

- Detail instructions for dosing sulfur control additives, measuring biogas quality, and what adjustments to operations and monitoring should be done depending on the measured biogas quality.

# 3. Processes and Procedures

## 3A. Dosing Sulfur Control Additives

- Sulfur control additives may be dosed three to five times per week, Monday to Friday
  - No dosing is usually done on weekends
- Two options are available for sulfur control additives:
  - Liquid additives, and
  - Solid or powder additives

### Liquid Additives Dosing

- For dosing the liquid additives, connect a 4-inch hose intended to be used to pump off tankers to the liquid additive tote.
- Once it's attached, log into the plant PC remotely from your phone. On the feedstock receiving screen, select the source (Truck) and the destination (T-002,

Dual Purpose Tank) in the upper left corner, then hit the START button for Liquid Receiving. At this point, the following valves automatically open: FVK-10M, FVK-10B, FVK-10D, and FVK-30A. While the valves are opening, the Muffin Monster (G-001) ramps up to 45 Hz.

- Once the valves are fully open and the Muffin Monster reaches 45 Hz, the Recirculation/Dilution Pump (P-002) comes online at 240 GPM, running at 60 Hz.
- When the pump hits this speed, open the valve on the liquid tote and dose the system as needed.
- Once the desired amount is dosed, close the tote valve, disconnect the hose, and roll it back to the pump to drain any remaining liquid.
- After that, the operator will hit the red STOP button to shut off the pump, grinder, and close all valves.
- Next, change the source from Truck to T-002 (keeping T-002 as the destination), and hit START again to circulate the liquid additive dose through the DP tank for at least 10 minutes.
- Once that's done, the operator shall hit the STOP button to finish the process.

**Solids or Powder Additives Dosing**

- To prepare the powder additive for dosing, add the required amount (i.e. one bag) to a tote filled with water and mix the powder in.
- Dose water-powder mixture per the same instructions as the liquid additive dosing instructions above.
    - The tote with the water-powder mixture, replaces the ferric chloride tote
    - As the individual bags of powder represent part or all of the daily dose, the entire tote will be dosed

Alternatively,

- Add the powder bag directly to the solids hopper, do not open the bag first. The paper bag will be torn open by the grinding action in the solids hopper.
- Adjust the plant PC to change the source to T-008 (the underground receiving tank) for dilution, and the destination to HOPPER/T-001, with T-001 being the BM tank.

## 3B. Measuring Biogas Quality

- Turn on biogas meter and allow to warm-up per manufacturer's instructions
    - The current biogas meter in use is a Sewerin Multitec 545; warm-up period is five (5) minutes.
- When the biogas has warmed up and is reading 20.9% oxygen and zero (0) for all other parameters, biogas measurements can begin.
- Biogas measurements will be taken from the ball valve below the butterfly valve on the descending biogas pipe exiting the digester.
- Open the ball valve and connect the biogas meter hose to the connecting point.
- Wait for the readings on the display to stabilize.

- Once the reading stabilizes, record the biogas measurements per the record keeping instruction in section 4 of this SOP.

## 3C. Operational Response and Actions – below 900 ppm $H_2S$

- When the $H_2S$ is below 900 ppm, no major actions need to be taken
- Depending on the variability and trend of the $H_2S$ readings over the past three to 5 readings, adjustments to the additive dosing can be made
    - If the $H_2S$ is trending upward, increase additive dose
    - If the $H_2S$ is trending downward, decrease additive dose
    - If the $H_2S$ is stable, maintain additive dose
- The magnitude of the change to the additive dose will made per the operator's experience, historical operating data, and recent feedstock receiving data

## 3D. Operational Response and Actions – above 900 ppm $H_2S$

- When the $H_2S$ reading is above 900 ppm, two major actions must be taken:
    1. Increase biogas testing frequency to at least once per day
    2. Increase additive dosing rapidly to reduce the $H_2S$ concentration
        a. Exact dosing increase will be at the Operator's judgement and informed by operator experience and feedstock and $H_2S$ trends leading up to the 900+ ppm reading.
- When the $H_2S$ reading decreases to less than 900 ppm, biogas measurements can return to being performed once per week and the additive dosing may be reduced at the operator's discretion.

## 4. Record Keeping and Reference Documents

- Daily Worksheet
    - For each measurement taken record:
        - $H_2S$ concentration in ppm
        - Date, time, and location of measurement taken
        - Name of the person conducting the measurement
        - Corrective actions taken, if any
            - Include description, date, and time of action
            - If no actions are taken, mark "No action"
- Site Laboratory Safety Guideline
    - Comprehensive list of safety procedures, emergency procedures, and accident reporting

## 5. Document Updates

- 28-Oct-2024 document created
- 27-Nov-2024 document revised

# Appendix 5 – Monitoring, Recording, and Reporting SOP

RENERGY

Monitoring, Recording, and Reporting SOP (To be updated following final design and construction of the revised monitoring systems)

# Standard Operating Procedure: Monitoring, Recording, and Reporting

## Table of Contents

1. Summary Opening
2. Objectives
3. Biogas Monitoring and Recording (Supplemental Gas and In-Situ $H_2S$ Control)
4. Combustion Devices Downtime
5. Biogas Leak Monitoring
6. Pressure Relief Monitoring
7. In-Situ Hydrogen Sulfide Treatment
8. Semi-Annual Report to EPA
9. Document Updates

## 1. Summary Opening

- The monitoring, recording, and reporting SOP contains template tables for all recording and reporting required for the compliance measures, as well as a template report to prepared for the EPA semi-annually, due by January 31 and July 31 of each year.

## 2. Objectives

- Compilation of all compliance monitoring and recording required.
- Includes recording table templates to be included in the semi-annual reports to the EPA.

## 3. Biogas Monitoring and Recording (Supplemental Gas and In-Situ $H_2S$ Control)

- As part of the daily biogas monitoring, the parameters listed in the table below shall recorded and/or calculated in the daily worksheet
  - If the heating value calculations show that supplemental gas must be introduced or adjusted if already being used, record the adjustment and new target supplemental gas flow rate as per the Supplemental Gas Addition SOP.
  - Real-time supplemental gas flow rate will also be recorded automatically in the SCADA

**Daily Biogas Monitoring Reference Table**

| Parameter | Sub-Parameter | Frequency | Record | Notes |
|---|---|---|---|---|
| Biogas Quality | Methane ($CH_4$) | Daily | Yes | Use to calculate heating value |
| | | Once per flare cycle | Yes | Measure once per flare cycle when supplemental gas is being used |
| | Heating Value | Daily (calculate) | Yes | |

| | | | | |
|---|---|---|---|---|
| | | Once per flare cycle (calculate) | Yes | Measure once per flare cycle when supplemental gas is being used |
| | Hydrogen Sulfide ($H_2S$) | Once per week | Yes | Measure at least weekly if concentration is below 900 ppm |
| | | Daily | Yes | Measure at least daily if concentration if above 900 ppm |
| Supplemental Gas Flow | - | Continuous by flow meter | Yes | Recorded automatically in SCADA |

## 4. Recording Combustion Devices Downtime

- All planned and unplanned downtimes for combustion devices shall be recorded
    - Additionally, if a temporary combustion device is brought in, the details shall also be recorded

**Combustion Device Downtime Record Table**

| Start time & date | End time & date | Description of affected device | Location of Device |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**Temporary Combustion Device Installation Table**

| Start Time & Date | Location of Device | Permanent or Temporary |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## 5. Biogas Leak Monitoring (Monthly)

- The biogas leak monitoring program shall be conducted monthly for all Covered Equipment, except for the biogas dome connection perimeter, which will be measured for leaks twice per year

**Monthly Biogas Leak Recording Table** (list of covered equipment may change)

| Location Name | Location ID | Methane Measurements | | Date and Time Measurement Recorded | Initials |
|---|---|---|---|---|---|
| | | 0ppm Measurement (Check box if applicable) | If not 0ppm, record highest measurement: | | |
| Over-Under relief port on digester tank | | | | | |
| Mechanical pressure relief valve on digester tank | | | | | |
| Biogas sample point ball valve (near under-over valve) | | | | | |
| Access hatches on biomass tank or digester tank, including but not limited to sludge removal hatches | | | | | |
| Pressure relief valve on biomass tank | | | | | |
| Valves or gas pipe between biomass tank and digester tank headspace | | | | | |
| Radar sensor port | | | | | |
| View port | | | | | |
| Biogas dome ball valve sample port | | | | | |
| Biogas dome pressure sensor connection point | | | | | |
| Weather dome vent | | | | | |
| Butterfly valves on flare and engine biogas pipes | | | | | |
| Ball valves on flare biogas pipes | | | | | |
| Flare blower connections | | | | | |
| Engine blower connections | | | | | |
| Condensate pipes and trap | | | | | |
| Desulfurization blower | | | | | |

| Location Name | Location ID | Methane Measurements | | Date and Time Measurement Recorded | Initials |
|---|---|---|---|---|---|
| | | 0ppm Measurement (Check box if applicable) | If not 0ppm, record highest measurement: | | |
| Any other valves or ports identified as connected to biogas service. | | | | | |

### Annual Biogas Dome Leak Monitoring

| Location Name | Location ID | Measurements | | Date and Time Measurement Recorded | Initials |
|---|---|---|---|---|---|
| | | Check Box if 0ppm detected | If not 0ppm, record highest measurement: | | |
| Biogas dome membrane | | | | | |
| Any other valves or ports identified as connected to biogas service. | | | | | |

### Equipment Replacement Record Table

| Equipment replaced | Date | Follow-up testing deemed successful (Yes/No) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## 6. Pressure Relief Monitoring

The following instructions apply to pressure relief monitoring via Visual, auditory, and olfactory observations and pressure sensor alarms.

- All Observations shall be recorded and include the date and time, description of the event, and whether venting was confirmed to be occurring
    - If venting is confirmed, the cause of venting, corrective actions taken, date and time of said actions beginning, and the date and time of the PRV closing shall be recorded
- All confirmed venting events shall be reported to the EPA within 24 hours
- Inform the US EPA of the incident by telephone at (312) 886-2776 or by email to R5AirEnforcement@epa.gov and Schulz.Natalie@epa.gov.

**Pressure Relief Monitoring (Visual, auditory, or olfactory observations) Table**

| Date & time | Location of Observation | Description of event | Venting Confirmed (Yes/No) | If yes, Corrective actions taken | Date & time of corrective actions | Date & Time of PRV closure | Notification to EPA sent |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Pressure Relief Monitoring (Pressure Alarm) Table**

| Date & time of Alarm | Cause of Alarm | Venting Confirmed (Yes/No) | If yes, Corrective actions taken | Date & time of corrective actions | Date & Time of PRV closure | Notification to EPA sent |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Pressure Relief Monitoring (PRV opening) Table**

| Date & time of PRV opening | Cause of Opening | Corrective actions taken | Date & time of corrective actions | Date & Time of PRV closure | Notification to EPA sent |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## 7. In-Situ Hydrogen Sulfide Treatment

- For each $H_2S$ measurement taken, the date and time, location of measurement, measurer's name, and reading value shall be recorded.
  - If corrective action for $H_2S$ is deemed necessary, record the action taken and the date and time of said corrective action.
- If $H_2S$ in the biogas is measured below 900 ppm, continue measuring at least once per week.
- If $H_2S$ in the biogas is measured above 900 ppm, increasing testing to at least daily until the $H_2S$ measurements return to below 900 ppm.

**$H_2S$ Measurement and Corrective Actions Table**

| Date & Time | Location | Measurer's Name | Value (ppm $H_2S$) | Corrective Action Taken | Date & Time |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

## 8. Semi-Annual Report to EPA

- Semi-annual reports to the EPA pertaining to the status of all compliance measures mentioned above for the previous six months shall be submitted by Renergy.
- The reports must be submitted by January 31 and July 31 of each year.
- The reports shall include all of the above tables pertaining to compliance monitoring and recording:
    - Supplemental gas and net heating value
    - Combustion devices
    - Leak Monitoring
    - Pressure Relief Monitoring
    - Maintenance of Process Equipment
    - In-Situ Hydrogen Sulfide Treatment
- The report shall also include
    - status of compliance measures
        - problems encountered or anticipated, together with implemented or proposed solutions
    - status of permit applications
    - operation and maintenance
    - reports to state agencies
    - Descriptions of any non-compliance event, cause, and remedial steps taken
- Prepare the semi-annual report using the “EPA Semi-Annual Compliance Report template”

## 9. Document Updates

- 28-Oct-2024 document created
- 27-Nov-2024 document revised

# Appendix 6 – List of Documents Considered

## Appendix 6

### List of Documents Considered

1. Federal Income Tax Returns for Renergy Inc., 2019-2023.

2. Renergy Inc. and Subsidiaries Financial Statements, 2018-2024.

3. Loan Information for Renergy Inc., Affiliates, and Subsidiaries.

4. Renergy Inc. Summary of Related Party Notes, 2018-2024.

5. Renergy Inc. Organizational structure and relationships with affiliates.

6. Renergy Inc. and Alexander Ringler Close Corporation Agreement, March 17, 2015.

7. Dovetail Energy, LLC and Quasar Energy Group, LLC Membership Redemption Agreement, March 7, 2017.

8. Responses to Information Requests, November 2024 and March 2025